**UNITED STATES of America**

v.

**Morris LANDSMAN, Defendant.**

**No. 73 Cr. 44.**

United States District Court,
S. D. New York.

Aug. 24, 1973.

David A. Goldstein, New York City, for defendant.

Paul J. Curran, U. S. Atty., by Peter L. Truebner, Asst. U. S. Atty., New York City, for the United States.

## MEMORANDUM AND ORDER

PIERCE, District Judge.

Morris Landsman is charged in this indictment with bribery of an IRS agent on or about December 13, 1972. The indictment was filed January 12, 1973, and the matter set down for arraignment on January 22, 1973. On January 20, 1973, the defendant was admitted to Mt. Sinai Hospital with complaints apparently associated with a large left internal carotid aneurysm (giant aneurysm) at the base of the frontal lobe of the brain which had been discovered in December of 1971.

Defense counsel immediately brought the defendant's condition to this Court's attention, raising first the question of his physical competency to stand trial, and then the question of mental competency. During the ensuing months the defendant has been examined by three doctors retained by the defendant, and by three Court-appointed doctors, pursuant to 18 U.S.C. § 4244, with respect to the issue of mental competency and, pursuant to a similar procedure established by the Court, on the issue of physical competency. Reports from a total of eight doctors have been filed with this Court on one or both competency issues.

Because the conclusions set forth in these reports are in conflict, this Court

---

* Deleted for purposes of publication.

ordered a competency hearing on both the issue of physical and mental competency, scheduled, first, for June 1, 1973, immediately prior to trial. The hearing and the trial were adjourned at defense counsel's request for unrelated reasons until August 23, and August 27, 1973, respectively. At the hearing the Court required the defendant's presence for a brief period in order to explain to him on the record his rights and risks with respect to the issues being decided. The defendant did appear, and after the Court talked with him, he was given the option to stay for the hearing or to leave. He chose to retire to the witness room where a cot had been provided for him, and later left the Courthouse. He was not, therefore, present during the hearing.

Four doctors, each of whom have examined the defendant recently, testified at the hearing. Two of them were retained by the defendant—Dr. Labe C. Scheinberg and Dr. Edwin A. Weinstein; and two were Court-appointed—Dr. Bennett M. Derby and Dr. Norman Weiss. This Court would not be so bold as to venture a summary of the testimony in medical terms, but the gist of what the doctors say is as follows.

The doctors are in accord on a number of factual matters. The defendant has a giant aneurysm near the left optical nerve at the base of the left frontal lobe of the brain. Such aneurysm is the cause of the defendant's progressively deteriorating eyesight. He is at this time functionally blind in the left eye, and his sight in the right eye has been reduced to a half-field due to loss of peripheral vision. They agree that the aneurysm is not operable and that its effects are irreversible and progressive. They agree that a giant aneurysm, such as the defendant has, usually expands slowly and that the chances of it rupturing are far less than with the smaller, congenital type of aneurysm; but that rupture could occur in spite of the medication for high blood pressure presently prescribed for the defendant. They agree that emotional stress increases the

risk and that should rupture occur it could cause death or serious brain damage. They agree that the defendant is severely depressed, apathetic, and exhibits impaired judgment and memory deficits.

In short, the doctors agree that the defendant is not a well man, physically or mentally, and this Court accepts this general conclusion. However, many people who are not well are legally able to stand trial, and it is this Court's heavy burden to decide whether or not, in this instance, the defendant's physical or emotional problems are so severe as to bar a substantial public interest in the resolution by trial of a criminal indictment.

As to the defendant's physical competence, this Court must determine if the defendant's presence at trial would substantially increase the risks to his health or life; and whether his present physical condition is such that it may substantially impair his ability to present a proper defense. See United States v. Knohl, 379 F.2d 427, 436–437 (2d Cir. 1967); United States v. Sweig, 316 F. Supp. 1148, 1165–67 (S.D.N.Y.1970). I am as satisfied as is possible under the circumstances that the defendant's presence and participation in this short trial will not substantially increase the risk of the aneurysm rupturing, particularly given the agreement that a giant aneurysm usually expands slowly and does not often rupture. This would seem to represent the consensus of the doctors, although the range of expressed probability varies from Dr. Derby's estimate that the chances of rupture are one in a thousand to Dr. Weinstein's carefully couched statement that there is "some risk, but not high in percentage terms." The Court takes its lead (and what comfort it can), however, from Dr. Scheinberg, the defendant's personal neurologist. He says that "there is not much greater risk in rupture at trial than under ordinary life stress and circumstances," which the defendant endures daily. Thus, with the safeguards which are more fully set out at the end of this

decision, it would seem that there is not substantial physical risk such as to warrant the adjournment of the trial. In fact, because the defendant's physical condition will progressively worsen, albeit slowly, it is imperative to proceed with trial as soon as possible if there is going to be a trial at all. See United States v. Sweig, *supra* at 1167. Whether or not the defendant's physical condition is such that it may impair his ability to present a proper defense is a different issue, and in this case, is better confronted in connection with the question of mental competency.

As to the defendant's mental competency to stand trial, this Court must determine whether the defendant is presently insane, or otherwise so mentally incompetent that he is either unable to understand the proceedings against him, or unable to assist his defense counsel in his own defense. 18 U.S.C. § 4244. The test which this Court must apply is whether or not the defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; and, with a rational as well as a factual understanding of the proceedings against him. See United States v. Sullivan, 406 F.2d 180 (2d Cir. 1969).

Although the doctors each describe essentially the same outward manifestations of the defendant's state of mind, they are at odds with respect to the severity, the cause and the conclusions to be drawn from the symptoms.

Dr. Scheinberg, and to an even greater extent, Dr. Weinstein, believes that the defendant's severe depressive state and attendant behavior is the result of an organic brain disease, caused by the aneurysm pressing against the area of the brain which controls the mental processes involving judgment, memory, ethics, etc. Both conclude that the defendant is irrational and legally incompetent to stand trial. Dr. Weiss and Dr. Derby believe that the defendant's behavior is the result of a moderate to severe reactive depressive state, exacerbated by the rather sudden change in the circumstances of the defendant's life, from a successful accountant in his early fifties, to a man in his late fifties indicted for a federal felony, beset by an untreatable 1½ inch balloon in his brain and unable to work because of both of these factors. Each concludes that the defendant is rational and is competent to stand trial.

This Court does not intend to attempt to choose between these theories of causation. For the questions which must be resolved here, it is the effect, not the cause, which is the critical issue.

All of the doctors relate that they have discussed the pending criminal charge with the defendant and their descriptions of those conversations convinces this Court that the defendant has a good grasp of what he is charged with, of the possibilities of an entrapment defense, of the consequences of a conviction, of his legal rights, and of a general concept of how a trial proceeds. Therefore, it seems reasonably certain that the defendant has a factual understanding of these proceedings.

In this Court's view, there are two serious questions remaining, both related to his ability to assist his attorney in his own defense.

The first is concerned with the defendant's rationality. The defense doctors both view the defendant's insistence on continuing to work in spite of his obvious handicaps and impaired judgment as evidence of total irrationality. They also cite his tendency to blame others for his current legal straits; his denial of the seriousness of his illness; his preoccupation with death; and his expressed lack of will to assist in his defense. Dr. Weinstein goes further and, based on the defendant's behavior, his denial syndrome and two positive sodium amytal tests, concludes that the defendant is suffering from paranoia and an organic psychosis which renders him utterly unable to rationally assist in his defense.

The two Court-appointed doctors agree that the defendant has no will to

assist in his defense, but attribute this more directly to his present life circumstances and the resultant depression. The amytal test, they agree, is a useful adjunct to the diagnosis of brain disease, but is not dispositive.

This Court has concluded that the defendant is capable of rational communication with his attorney. This conclusion is reached, first, because the testimony of three of the doctors seems to support it. Even Dr. Scheinberg, the doctor who should know the defendant best, says that he has the "ability to consult with his lawyer with rational understanding," although the doctor does not believe that the defendant will do so. Second, the behavior attributed to the defendant strikes this Court as not inconsistent with what might be expected —at least in gross terms—of a man faced with these prospects. Bizarre as some of the defendant's acts may seem, the fact is that he has cooperated with each of these doctors. In April, Dr. Scheinberg found him "alert, oriented, cooperative, coherent, fluent and reasonable," and the doctor does not seem to have changed his view as to those characteristics in the interim. Dr. Derby reports that at the most recent interview the defendant related better than he had in April and that "his appearance and demeanor were in decided contrast to his continuous history of depression." This indicates to the Court that the defendant has the ability to cooperate. The lack of will to use it would not seem to call for a finding of incompetence. In fact, even if the defendant were mentally ill, it would not necessarily make him incompetent to stand trial. United States v. Adams, 297 F.Supp. 596 (S.D. N.Y.1969).

The remaining question is whether or not the defendant's memory impairment renders it impossible for him to assist in his own defense. All doctors agree that the defendant is generally oriented as to time and place and things, and that his memory is such that it is sufficient for him to be able to relate past events in his own manner to his attorney. These conclusions are supported by the defendant's obvious ability to discuss the 1972 offense with the doctors, and to give his personal history to the doctors. But, as to his present memory, the two defense doctors indicate that it is severely impaired; that in their consultations with him, he frequently forgot what had been said a few minutes before. They seriously doubt his ability to sit in the Courtroom, to listen to testimony and to remember and discuss that testimony a few minutes later with his attorney. The two Court-appointed doctors believe that the actual impairment is not that serious, that whether or not the defendant can concentrate on testimony and remember is a matter of will. Dr. Weiss indicates that the defendant's memory is slow, but essentially intact. He notes that the defendant was able to recall the doctor's name far into the one hour interview with him. Dr. Derby indicates that the defendant performed a serial subtraction test crisply and rapidly; Dr. Weinstein indicates that the defendant discussed the Watergate hearings with him, albeit, with poor recall of the participants. But, perhaps the decisive testimony was that of Mrs. Francis Kahn, the government's lay witness. Mrs. Kahn, who is an IRS tax auditor, testified that on June 1, 1973 (parenthetically, the date this competency hearing was first scheduled to be held) and again on June 15, 1972, she participated in an informal conference with respect to a taxpayer's audit in her office. She reports that the defendant was present, representing the taxpayer, and that she talked with him for almost an hour on each occasion, discussing the taxpayer's return as it related to the IRS Code. Although Mrs. Kahn noted that the defendant's behavior was in some respects somewhat unusual (i.e., his flirtatiousness), her testimony demonstrated that the defendant had no problem understanding what she was saying, nor did she have a problem following his conversation. It is clear that in that situation,

the defendant was able to retain and retrieve and relate to what had occurred over an hour's span of time, if not a two-week time span. Mindful that some recollection of events is not enough alone to support a finding of competency, Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), and yet also mindful that a memory problem alone does not automatically lead to a finding of mental incompetency, see United States v. Knohl, *supra* 379 F.2d at 436, this Court finds that on balance the defendant's memory ability is sufficient to assist his attorney in his own defense.

This Court, having found the defendant both physically and mentally competent does, therefore, order that the trial proceed as scheduled on Monday, August 27, 1973, at 10:00 a.m.

In full recognition of the defendant's limitations, this Court further will take the following precautions:

The government is requested to have available a place and a cot close to the Courtroom where the defendant may lie down and rest;

The defense counsel is requested to make whatever arrangements he deems appropriate with respect to the defendant's medication and medical care; and, in this respect, the Court will accomodate the schedule of an attending physician retained by the defendant, and if necessary, reduce the trial day to three or four hours;

The Court will take frequent breaks, and will depend upon defense counsel to keep the Court informed of when those breaks might be necessary;

The Court assumes that the defendant will continue to do all in his power to protect his health during these proceedings, including continued medication for high blood pressure which is presently prescribed for him, and any other precaution which may be set forth by his doctors.

So ordered.